IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: | ) |
| | ) |
| LISA KAY WEISER, | ) Case No. 07-40714-13-ABF |
| | ) |
| Debtor. | ) |

ORDER OVERRULING DEBTOR'S OBJECTION TO
COMMUNITY AMERICA CREDIT UNION'S CLAIM
AND
SUSTAINING COMMUNITY AMERICA CREDIT UNION'S OBJECTION
TO CONFIRMATION OF THE PLAN

Debtor Lisa Kay Weiser owns a vehicle which was financed by the predecessor to creditor Community America Credit Union ("Community America"). She objects to Community America's fully-secured proof of claim, asserting that, because the loan proceeds were used for items other than the purchase of the vehicle, the hanging paragraph of § 1325(a) does not apply, and the claim should be bifurcated into secured and unsecured portions based on the value of the vehicle. In particular, she argues that since a portion of the loan proceeds was used to pay off a lien on the vehicle which she traded in, and to purchase an extended service warranty and gap insurance on the new vehicle, such lien does not represent a purchase money security interest secured by a motor vehicle, within the meaning of the hanging paragraph. Community America Credit Union objects to the Debtor's plan because it does not treat its claim as fully secured. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (K), and (L) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons that follow, the Debtor's Objection to Community America Credit Union's Claim is OVERRULED and Community

America Credit Union's Objection to Confirmation of the Plan is SUSTAINED.

On September 15, 2006, the Debtor entered into a Retail Installment Contract and Security Agreement (the "Agreement") with Van Chevrolet-Cadillac ("Van Chevrolet") to purchase a 2006 Pontiac G6 with a purchase price of $14,434.50. As part of that transaction, the Debtor traded in a 2006 Toyota RAV4 which she had purchased from another dealer about a month earlier. At the time of the trade-in, the Debtor owed Toyota Motor Finance $30,031.64 for the RAV4. Van Chevrolet paid off the debt to Toyota and gave the Debtor a $21,000 trade-in allowance for the RAV4, leaving her with a negative net trade-in of $9,031.64, which was added to the amount being financed by Van Chevrolet. In addition, the Debtor purchased an extended service contract on the Pontiac for $2,555 and gap insurance[1] for $750, both of which were also added into the amount being financed. With the negative trade-in, the service contract, and the gap insurance, Van Chevrolet financed a total of $26,771.14 at 10.55% interest. The Debtor was to make 75 monthly payments of $491.13 beginning on October 30, 2006. Shortly after the transaction, Van Chevrolet assigned the Agreement to Community America. The lien evidenced by the Agreement was promptly filed with the Missouri Department of Revenue, and Community America is the lienholder of record.

The Debtor filed a Chapter 13 Petition on March 12, 2007. Community America filed

---

[1] Gap insurance is used when a borrower finances more than the car is worth. It covers the difference between the car's value and what is owed to the lienholder on it, such that if the car is totaled in an accident, for example, and the collision insurance only pays the value of the car, the gap insurance will cover the remainder so that the borrower is not left with a deficiency owed to the lienholder.

a Proof of Claim asserting a fully secured claim of $28,251.24, which is the amount due under the Agreement as of the Petition date, including the negative equity, service contract, and gap insurance.

As a general matter, § 506 of the Bankruptcy Code allows debtors to bifurcate claims into secured and unsecured components based on the value of the collateral securing the claim.[2] For Chapter 13 cases, § 1325(a)(5) provides that, to retain the vehicle, a debtor must propose to pay the secured portion in full over the course of the plan, with interest, unless the creditor accepts less. Section 1325(a) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 to provide as follows:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [period] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.[3]

Hence, if a creditor fits within one of the descriptions found in this hanging paragraph provision,[4] then § 506(a)'s bifurcation provision does not apply, the creditor has a secured claim for the full amount due as of the date of the filing of the petition, regardless of the value of its collateral, and the court cannot confirm a plan proposing to pay that creditor less

---

[2] 11 U.S.C. § 506(a)

[3] 11 U.S.C. § 1325(a)(*).

[4] Sometimes referred to as "910 claims."

than the full amount of its claim.

The Debtor contends that the claim should be bifurcated based on the car's value, which she asserts is $15,295. Community America objects to confirmation of the Debtor's plan, as amended October 31, 2007, which is unclear as to treatment, but states that Community America's claim "is not a 910 claim as it included other moneys paid."[5]

The parties do not dispute that the debt to Community America was incurred within the 910 days preceding the bankruptcy filing, or that the Debtor acquired the Pontiac for her personal use. Thus, if Community America's lien is a "purchase money security interest" securing its debt, then Community America has a secured claim for the full amount due as of the date of the filing of the petition and the Debtor must propose to pay its entire claim in full.

Because the Bankruptcy Code does not define "purchase money security interest," bankruptcy courts look to state law to determine whether a creditor has one.[6] In doing so, courts look to the applicable state's version of § 9-103 of the Uniform Commercial Code. While Missouri does not apply the UCC to motor vehicle liens, the definition in that section is a useful guide to Missouri's use of the term "purchase money security interest." In

---

[5] Although the Debtor's original plan did not provide for a monthly payment to Community America, it listed Community America as a claim to which § 506 is not applicable. Her first amended plan, filed on September 10, 2007, provided for a monthly payment of $245, although it did not say for how many months.

[6] *See Gen. Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252, 257 (W.D. N.Y. 2007) (citations omitted); *In re Burt*, ___ B.R. ___, 2007 WL 4087071 at *3 (Bankr. D. Utah Oct. 24, 2007) (citations omitted).

Missouri, § 9-103 provides, in relevant part, that "[a] security interest in goods is a purchase-money security interest . . . to the extent that the goods are purchase-money collateral with respect to that security interest."[7] "Purchase-money collateral" is defined as goods or software that secures a purchase-money obligation incurred with respect to that collateral."[8] And, "purchase-money obligation" means "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."[9]

Thus, the question of whether, and to what extent, Community America has a purchase money security interest (PMSI) in the Pontiac turns on whether the negative equity from the Debtor's trade-in, the service contract, and gap insurance constitute either "part of the price of the [Pontiac]" or "value given to enable the [D]ebtor to acquire rights in or the use of the [Pontiac]."[10]

Many courts refer to Comment 3 to § 9-103 in their effort to determine the issues presented here because it seeks to define some of the terms in § 9-103.[11] Comment 3 states that:

---

[7] Mo. Rev. Stat. Ann. § 400.9-103(b)(1).

[8] Mo. Rev. Stat. Ann. § 400.9-103(a)(1).

[9] Mo. Rev. Stat. Ann. § 400.9-103(a)(2).

[10] *See Peaslee*, 373 B.R. at 258 (applying New York's version of § 9-103, which is, for all practical purposes, identical to Missouri's version).

[11] *Id.*

> As used in [§ 9-103(a)(2)], the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.[12]

The Debtor argues that negative equity rolled into the purchase of a new vehicle is not one of the enumerated items in the Comment, nor is it "similar" to any of those items because it "is not of the same type or magnitude" as the listed items. The Debtor further asserts that the rolling in of negative equity does not have a sufficiently close nexus to the acquisition of the new car because it is a "non-compelled accommodation to facilitate the purchase of the new car," and does not add value to the car.

The courts addressing this issue are sharply divided. Certainly, several courts have agreed with the Debtor's position here.[13] Other courts, including the two District Courts considering appeals of these cases, have disagreed, concluding that, under the language of the statute and its Comment, negative equity can constitute an "expense[] incurred in

---

[12] Mo. Rev. Stat. Ann. § 400.9-103, Comment 3.

[13] *See, e.g., In re Pajot*, 371 B.R. 139 (Bankr. E.D. Va. 2007); *In re Acaya*, 369 B.R. 564 (Bankr. N.D. Cal. 2007); *In re Price*, 363 B.R. 734 (Bankr. E.D. N.C. 2007); *In re Peaslee*, 358 B.R. 545 (Bankr. W.D. N.Y. 2006), *rev'd, Gen. Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252 (W.D. N.Y. 2007).

connection with acquiring rights in" the new vehicle.[14] Therefore, such negative equity can be "value given to enable the debtor to acquire" the vehicle. I agree.

Further, the Debtor here testified that she could not have purchased the Pontiac unless Van Chevrolet took the RAV4 as a trade-in and financed the difference between what she owed Toyota on it and what it was worth.[15] Since the rolling in of the negative equity was integral to the sale, such that one would not take place without the other, I find that there is a "close nexus" between the acquisition of the Pontiac and the portion of the obligation used

---

[14] *Gen. Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252, 259 (W.D. N.Y. 2007) (reversing the bankruptcy court's decision that negative equity was not part of the PMSI, and holding that, "[i]f the buyer and seller agree to include the payoff of the outstanding balance on the trade-in as an integral part of their transaction for the sale of the new vehicle, it is in fact difficult to see how that could *not* be viewed as such an expense") (emphasis in original); *Graupner v. Nuvell Credit Corp.*, ___ B.R. ____, 2007 WL 1858291 at *2 (M.D. Ga. 2007) (holding that where the parties to the transaction agree to a "package transaction" in which "[t]he negative equity is inextricably intertwined with the sales transaction and the financing of the purchase," one could certainly conclude that "[t]his close nexus between the negative equity and this package transaction supports the conclusion that the negative equity must be considered as part of the price of the collateral"); *In re Burt*, ___ B.R. ____ 2007 WL 4087071 (Bankr. D. Utah Oct. 24, 2007) (holding that an interpretation whereby negative equity and other costs related to the purchase of the collateral are included in the PMSI is consistent with the plain language of the Bankruptcy Code and the UCC, and that the hanging paragraph prohibits the cram down of a secured creditor's claim where negative equity on the debtor's trade-in is financed together with the cash price of the new vehicle and other costs); *In re Cohrs*, ___ B.R. ____ 2007 WL 2186135 at *2 (Bankr. E.D. Cal. 2007) ("When a car buyer offers to trade in a vehicle as part of the purchase price for another vehicle, the charges incidental to transferring the trade-in vehicle are part of the purchase price of the new vehicle," and that "[t]hose charges are incurred to 'enable the debtor to acquire rights in' the new vehicle"); *In re Petrocci*, 370 B.R. 489, 499 (Bankr. N.D. N.Y. 2007) (stating that "negative equity financing is inextricably linked to the financing of the new car" since "[i]t is clear that one would not take place without the other").

[15] Specifically, the Debtor testified that she could not afford to make the payments on the RAV4 (which was why she decided to trade it in so shortly after acquiring it in the first place), much less make the payments on both cars, and that she did not have the means with which to pay the obligation to Toyota in full if Van Chevrolet did not do so.

to pay off the Toyota.[16]

Nevertheless, the Debtor points out that § 9-103 contains several specific provisions which are applicable to PMSIs in *non*-consumer transactions,[17] including an express provision in § 9-103(f) that a PMSI does not lose its status as such even if it also secures an obligation that is not a purchase money obligation.[18] Section 9-103(h) provides that the limitation of those provisions to transactions other than consumer goods transactions is "intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court may not infer from that limitation the nature of the proper rule in consumer goods transactions and may continue to apply established approaches."[19] Since the transaction at issue in this case is a consumer transaction, and the statute does not provide an express provision like that found in § 9-103(f) permitting the combining of purchase money and non-purchase money into one consumer transaction, the Debtor asserts that § 9-103(h) mandates that we look to Missouri case law on that issue.

I have already concluded that, under the language of the statute, negative equity from a vehicle trade-in in a situation such as this one is part of the PMSI. Thus, if the only alleged non-purchase money component of a transaction is this type of negative equity, we need not make further inquiry regarding Missouri law on the treatment of transactions combining

---

[16] *Accord, Peaslee*, 373 B.R. at 259.

[17] Mo. Rev. Stat. Ann. § 400.9-103(e), (f), and (g).

[18] Mo. Rev. Stat. Ann. § 500.9-103(f).

[19] Mo. Rev. Stat. An.. § 400.9-103(h).

8

purchase money and non-purchase money. Nevertheless, many bankruptcy courts have done so in this context, and because a vehicle transaction could contain a non-purchase money component other than negative equity from a trade-in, some discussion of Missouri law is warranted here.

Courts have essentially adopted two lines of authority regarding treatment of combined purchase money and non-purchase money transactions, known as the "dual status rule" and the "transformation rule." The dual status rule focuses largely on the "to the extent" language in § 9-103(b)(1), and "allows the security to be divided into that portion which encompasses purchase money debt and a different portion which represents non-purchase money debt."[20] Under the "transformation rule," unless the security covers *only* debt incurred in purchasing the collateral, it is not a purchase money security.[21] "Any refinancing of the original purchase money debt or combining it with other debt transforms the debt to non-purchase money status."[22] If the transformation rule applies to a transaction combining purchase money with non-purchase money, then the creditor's entire claim is transformed into a non-purchase money security interest, and, in a Chapter 13 bankruptcy case, the hanging paragraph would not apply. Hence, the debtor could bifurcate such a creditor's claim under § 506.

---

[20] *First Nat'l Bank of Steeleville, N.A. v. Erb Equip. Co.*, 921 S.W.2d 57, 62 (Mo. Ct. App. 1996).

[21] *Id.* at 61 (emphasis added).

[22] *Id.*

The Debtor points out that Missouri bankruptcy courts have previously determined that Missouri has adopted the transformation rule.[23] However, the Missouri Court of Appeals has since placed that determination into question. In *First Nat'l Bank of Steeleville v. Erb Equipment*, the Court of Appeals declined to adopt or reject any particular rule, but it reversed the trial court's decision applying the transformation rule, stating that it was "not prepared to say that under no circumstances can purchase money debt and non-purchase money debt be combined in a single security interest document."[24] However, in order for such a security interest to be enforceable, the Court of Appeals said that the instrument creating the purchase money security interest must "clearly delineate the respective debts involved, which item of collateral secures its purchase money, and the amount of the payments which are to be applied against each purchase money portion of the instrument."[25] Based on this language, it appears that Missouri has adopted a sort of hybrid approach – it will apply the dual status rule, but only if the dual status aspect of the transaction is properly documented, including how payments are to be allocated. Otherwise, sorting out the purchase money from the non-purchase money is too difficult to determine, and the transformation rule applies, such that the entire transaction loses its purchase money character.

---

[23] *In re Snipes*, 86 B.R. 1006 (Bankr. W.D. Mo. 1988) and *In re Parish*, 147 B.R. 187 (Bankr. E.D. Mo. 1992).

[24] 921 S.W.2d at 63.

[25] *Id.*

This discussion of Missouri law highlights why the negative equity from a vehicle trade-in is different from other types of combined purchase money and non-purchase money transactions. Courts typically apply the dual status and transformation rules in situations where a prior lender refinances an old loan and adds new collateral. The typical example is similar to that found in the Missouri Bankruptcy Court decisions applying the transformation rule, where, for example, the borrower first purchases a sofa and gives the lender a PMSI in the sofa, and then later purchases a dishwasher, and still later a refrigerator, and so on, executing a new agreement with the same lender each time, carrying over the previous balances from the purchases of the sofa, dishwasher, and refrigerator into each new contract, and granting the lender a security interest in all of the items.[26] In these cases, the value given by the creditor for the new item (*i.e.,* the refrigerator) has nothing to do with enabling the debtor to acquire rights in or the use of the prior items (the sofa and dishwasher). Since the entire debt is rolled into a new obligation, that new obligation does not represent value given "to enable the debtor to acquire rights in" the items that such debtor already owns. The dual status and transformation rules assist courts in the difficult task of hashing out what part of the remaining debt constitutes value given to enable the borrower to acquire each item. Missouri's hybrid approach is, therefore, particularly appropriate: if the lender properly documents the transaction so that one can tell exactly what is and what is not purchase money, and how payments will be allocated, the transaction will be interpreted accordingly;

---

[26] *In re Snipes*, 86 B.R. 1006; *In re Parish*, 147 B.R. 187.

otherwise, since allocating will be too difficult, the entire debt will be transformed and treated as if it was not purchase money.

In contrast, when a borrower trades in an old car for the purchase of a new one, only the new car secures the obligation. He no longer owns the old car (the sofa in the prior example), and the obligation on that old car is extinguished. Consequently, the difficulties in parsing out the obligations between debts and collateral are not present, and there is no prior obligation left to be "transformed." Further, since the new lender actually advances funds to pay off the prior lender, the "value given to enable the debtor to acquire rights in" the new car is readily discernable.

In sum, I hold that the payoff of the vehicle which was being traded in does not affect the purchase money status of Community America's claim, or the applicability of the hanging paragraph.

In this case, in addition to the negative equity, Community America also financed an extended service contract and gap insurance when the Debtor purchased the Pontiac.[27] For the same reasons discussed above with regard to the negative equity, I find that Community America has a purchase money security interest securing those portions of the debt under § 9-103 because they were expenses incurred in connection with the Debtor's acquiring rights

---

[27] I note that the Plan provides for the Debtor to reject both the extended service contract and the gap insurance. Since Community America holds perfected liens on both such items, any moneys refunded would be paid to Community America to reduce its claim.

in the Pontiac.[28] Since the Debtor would have had no reason to purchase these items had she not been purchasing the Pontiac, I find that there is a close nexus between those items and the Pontiac.[29]

Additional questions arise in connection with the service contract and gap insurance in the context of the hanging paragraph, however. Even though Community America has a PMSI in them, the language of the hanging paragraph provides that § 506 will not apply if "the collateral for that debt consists of a motor vehicle." The Agreement in this case provides that the service contract and gap insurance are secured, not only by the Pontiac, but also by the proceeds and premium refunds of those items. Some debtors have argued that, in such a situation, the collateral therefore consists of something in addition to the motor vehicle, rendering the hanging paragraph inapplicable.

---

[28] *Accord In re Burt*, 2007 WL 4087071 at * 9 (Bankr. D. Utah Oct. 24, 2007) (holding that a service contract and other fees are included in the PMSI); *In re Murray*, 346 B.R. 237, 240 (Bankr. M.D. Ga. 2006) (holding that "the simultaneous purchase of a motor vehicle and an extended service contract . . . does not prevent a creditor from taking a purchase-money security interest in the motor vehicle"); *In re Spratling*, ___ B.R. ___, 2007 WL 3102154 (Bankr. M.D. Ga. Oct. 19, 2007) (finding that, because the parties entered into a contract for both the vehicle and the gap insurance at the same time, the gap insurance would not exist without the vehicle, and the only function of the gap insurance is to protect the debtor's investment in the vehicle, there was a sufficiently close nexus between the acquisition of the car and the gap insurance to include the gap insurance in the PMSI); *In re Macon*, 376 B.R. 778 (Bankr. D. S.C. 2007) (holding that extended service contract and gap insurance had a close nexus to the purchase of the car so that the PMSI was not destroyed). *But see In re Hayes*, 376 B.R. 655 (Bankr. M.D. Tenn. 2007); *In re Price*, 363 B.R. 734, 741 (Bankr. E.D. N.C. 2007) (stating that gap insurance was neither mandatory, a component of the loan agreement, nor a value-enhancing add-on, and thus nor a part of the purchase price of the collateral).

[29] I note that under Missouri law, a creditor need not file separate documents to perfect a security interest in extended service warranties or insurance premiums if such items are tied to a vehicle on which such creditor holds a perfected lien. *See In re Smith*, 167 BR. 895, 898 (Bankr. E.D. Mo. 1994); *In re Watts*, 132 B.R. 31, 32 (Bankr. W.D. Mo. 1991).

I disagree. In contrast to the protection afforded to home mortgage lenders found in § 1322(b)(2), which requires that a creditor be secured "only by a security interest in real property that is the debtor's principal residence," the hanging paragraph does not require that a creditor be secured "only" by a vehicle.[30] Therefore, cases interpreting § 1322(b)(2) to require that a creditor be secured "only" by a mortgage in order to gain the protections of that section[31] are distinguishable.[32]

Moreover, even if the hanging paragraph does not require that a creditor be secured "only" by a vehicle, and the service contract and gap insurance are to be treated as something other than an integral part of the vehicle, the hanging paragraph also prevents bifurcation of a claim where the "collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing."[33] The Debtor in this case purchased the Pontiac, and thus the service contract and gap insurance, within one year prior to filing the Petition, and there is no question that they have value. As a result, they fit within the hanging paragraph's alternative definition of a claim protected from bifurcation.

ACCORDINGLY, the Debtor's Objection to Community America Credit Union's Claim is OVERRULED. Community America Credit Union's Objection to Confirmation

---

[30] *Accord In re Johnson*, 337 B.R. 269, 272-73 (Bankr. M.D. N.C. 2006).

[31] *See, e.g., In re Wilson*, 91 B.R. 74, 76 (Bankr. W.D. Mo. 1988) (holding that, since a creditor took a security interest in not only the proceeds from various insurance coverages, but also the return premiums, the creditor was secured not only by a security interest in real property, but by a security interest in personal property as well).

[32] *Accord In re Johnson*, 337 at 273.

[33] 11 U.S.C. § 1325(a)(*).

of the Plan is SUSTAINED.

    IT IS SO ORDERED.

                                      <u>/s/ Arthur B. Federman</u>
                                           Bankruptcy Judge

Date: 12/18/07